FILED
**United States Court of Appeals**
**Tenth Circuit**

**March 28, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ELLA CLINTON; WILLIAM
CARRICK; TERRI L. STAUFFER-
SCHMIDT; JEAN P. WRIGHT;
MICHAEL A. WEBBER; DONALD P.
COX; HOWARD ROSEN; WAI HEE
YUEN; MARTHA MILLER COX,

      Plaintiffs - Appellants,

v.                                                                No. 21-3035

SECURITY BENEFIT LIFE
INSURANCE COMPANY,

      Defendant - Appellee.

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:20-CV-04038-HLT-KGG)**

_____

Andrew S. Friedman of Bonnett Fairbourn Friedman & Balint PC (Francis J. Balint, Jr. of Bonnett Fairbourn Friedman & Balint PC, Phoenix, Arizona; Adam M. Moskowitz and Howard H. Bushman of The Moskowitz Law Firm, PLLC, Coral Gables, Florida; and Eric D. Barton of Wagstaff & Cartmell, LLP, Kansas City, Missouri, with him on the briefs), for Plaintiffs-Appellants.

Robert D. Phillips, Jr. of Alston & Bird LLP (Samuel J. Park and Gillian H. Clow of Alston & Bird LLP, Los Angeles, California; Michael A. Valerio of Alston & Bird LLP, Washington, District of Columbia; and James D. Oliver, Anthony F. Rupp, and Holly Dyer of Foulston Siefkin LLP, Overland Park, Kansas, with him on the brief), for Defendant-Appellee.

_____

Before **HARTZ**, **BACHARACH**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

Plaintiffs are consumers who sued Defendant Security Benefit Life Insurance Company under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and state law, alleging Security Benefit developed a fraudulent scheme to design and market certain annuity products. This appeal requires us to determine whether the district court properly dismissed Plaintiffs' first amended complaint without prejudice for lack of particularity and plausibility in pleading fraud. Because we conclude Plaintiffs have alleged facially plausible fraud claims with the particularity required under Federal Rule of Civil Procedure 9(b), the district court erred in granting Security Benefit's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further proceedings.

# I

## Background[1]

This case involves equity-indexed deferred annuities, a type of insurance product marketed and sold to Plaintiffs by Security Benefit. Before turning to

---

[1] We rely on the complaint's allegations for our account of this appeal's background.

our analysis, we will explain the technical features of this annuity. As we discuss later, the complaint's principal fraud claims concern these features and the alleged undisclosed effects of their collective operation on Plaintiffs' investments.

## A. Equity-Indexed Deferred Annuities

### 1. Basic Features

A deferred annuity is a contract between a consumer and an insurance company. A consumer purchases the deferred annuity with a single "up-front payment"—an initial premium—deposited into the consumer's account for a deferral period. Aplt. App. vol. 1 at 161 ¶ 23. The deferral period is a term of years specified in the annuity contract. The insurance company invests the consumer's initial premium over the deferral period. A deferred annuity is a long-term investment because an annuity owner often cannot access their initial premium during the deferral period without incurring a financial penalty. An annuity owner may receive a lump sum payment at the end of their deferral period, or a stream of periodic payments.

An equity-indexed deferred annuity—at issue here—gives consumers the choice to allocate their initial premium among several crediting options. Consumers may allocate their initial premium to a crediting option that provides a fixed interest rate "not less than a modest minimum guaranteed rate," or to a crediting option linked to designated stock indices. *Id.* at 161-62

¶ 24.[2] Equity-indexed deferred annuities are usually linked to third-party stock indices like the Standard & Poor's 500. One key feature of an equity-indexed deferred annuity is its performance is tied to the success of the linked financial market.

### 2. Participation Rates & "Caps"

The index-linked return credited to the investor can vary not only based on the performance of the stock index, but also based on the particular terms of the annuity contract. Participation rates and "caps" are common features of annuity products. A cap is a limit—usually a fixed percentage—on the amount an annuity owner earns from the underlying stock index's gains. A participation rate is the percentage of the underlying stock index's performance that the insurance company agrees to pass along to the investor.[3]

---

[2] An equity-indexed deferred annuity "guarantees a minimum return to the contract owner if the contract is held to maturity." Equity Index Insurance Products, Securities Act Release No. 7438, Fed. Sec. L. Rep. (CCH) ¶ 85,957 (Aug. 20, 1997). In this way equity-indexed deferred annuities "combine features of traditional insurance products (guaranteed minimum return) and traditional securities (return linked to equity markets)." *Id.*

[3] The district court provides an example: if an annuity's participation rate is 70% and the underlying index increases by 10%, then the annuity account is credited with 70% of the index's increase, or 7%. Aplt. App. vol. 8 at 1951.

Higher participation rates and higher caps yield a higher rate of interest credited to the annuity holder's account. Many equity-indexed deferred annuities impose both caps and participation rates.

## B. Security Benefit's Equity-Indexed Deferred Annuity Products

Shortly after being acquired by a private equity firm in 2010, Security Benefit developed and marketed equity-indexed deferred annuity products. It sold two annuities: the "Secure Income Annuity" and the "Total Value Annuity" (collectively, the "annuity products"). Aplt. App. vol. 1 at 157 ¶ 3. Investors paid fees and charges associated with the annuity products. Plaintiffs allege these annuity products share several features relevant to their fraud claims.

### 1. Proprietary Indices

Equity-indexed deferred annuities typically tie their performance to established financial markets like the Standard & Poor's 500. The annuity products at issue here were associated with proprietary stock indices used by Security Benefit.

From 2012 to 2015, Security Benefit used three proprietary indices. Two were linked to the Total Value Annuity product. One was linked to the Secure Income Annuity product.[4] Once a consumer bought one of these annuity

---

[4] The proprietary indices are called the "5-Year Annuity Linked TV Index," the "Morgan Stanley Dynamic Allocation Index Account," and the "BNP Paribas High Dividend Plus Annual Point to Point Index Account – Year 2." Aplt. App. vol. 1 at 158 ¶ 5. We discuss the individual proprietary

products, Security Benefit allowed the consumer to allocate some or all their initial premium to the corresponding proprietary index.

According to Plaintiffs, Security Benefit's annuities linked to the proprietary indices "would—by design—produce near-zero returns due to misrepresented and undisclosed features, risks, charges and attributes." Aplt. App. vol. 1 at 156-57 ¶ 2. Security Benefit misleadingly marketed the annuity products as attractive investment opportunities—uncapped and with 100% participation rates in the proprietary indices. But Plaintiffs allege the annuity products were, in practice, actually capped, and had less than 100% participation rates. The only information "reasonably available" to consumers about Security Benefit's proprietary indices, Plaintiffs allege, was in the documents created and provided to them by Security Benefit. *Id.* at 183-84 ¶ 84.

### 2. *"Backcasting" Proprietary Indices' Performance*

"Backcasting" is a methodology used to assess annuity performance by looking at a selective period of an asset's past performance to project its future returns. The proprietary indices used by Security Benefit were relatively new, but Security Benefit used backcasted past performance data for periods predating their creation. Security Benefit's backcasted data allegedly relied on

---

indices as they become relevant in our analysis of Plaintiffs' allegations and the district court's dismissal order.

"cherry-picked" periods when the proprietary indices' assets showed uncommonly high gains. *See* Aplt. App. vol. 1 at 174 ¶ 62. According to Plaintiffs, this representation of the proprietary indices' backcasted performance was misleading, inaccurately representing outsized future returns. Security Benefit also assumed a 100% participation rate over the backcasted period. This assumption was false, Plaintiffs allege, because "hedging costs associated with . . . market conditions would preclude" full participation in the proprietary indices. *Id.* at 174 ¶ 64. According to the complaint, Security Benefit thus misleadingly suggested Plaintiffs would receive future returns that could not actually be achieved. *See id.* at 174-75 ¶ 65.

### 3. *Volatility Control Overlay*

A volatility control overlay is a feature designed to prevent price variation in "assets encompassed by [an] index." Aplt. App. vol. 1 at 168 ¶ 46. For example, high volatility means a stock's price moves up and down in wide ranges within a short period of time. Lower volatility means the price changes at a slower, more gradual pace. In preventing price variation, the volatility control overlay is designed to protect investors from losses caused by asset volatility.

Plaintiffs claim Security Benefit made misrepresentations and omitted material information about the volatility control overlay feature of its annuity

products and how it affected their investments. For example, Security Benefit allegedly misrepresented that the volatility control overlay benefited Plaintiffs and other consumers who purchased the annuity products. However, Security Benefit's volatility control overlay offered Plaintiffs no benefit because the annuity products actually had a 0% interest floor. This means the owner never lost his initial investment. Security Benefit also failed to disclose that the volatility control overlay actually reduced Plaintiffs' investment returns. And the volatility control overlay increased a fee, called an "index cost spread," that Plaintiffs had to pay Security Benefit. *Id.* at 186 ¶ 91. According to Plaintiffs, Security Benefit made these misrepresentations and omissions in various documents described in the complaint.

### C. Security Benefit's Misrepresentations & Omissions About the Annuity Products

Plaintiffs claim Security Benefit fraudulently induced them to purchase their annuity products using two types of documents. These materials allegedly misrepresented that the annuity products would yield favorable investment returns. What these documents said—or failed to say—about the annuity products is central to Plaintiffs' claims.

### 1. *Marketing Materials*

Security Benefit allegedly induced Plaintiffs to purchase annuity products by using misleading marketing materials. According to Plaintiffs,

Security Benefit created backcasted performance data, then used it to hypothetically illustrate the proprietary indices' performance, and included those hypothetical illustrations, derived from backcasted data, in its marketing materials to represent favorable future returns.

The marketing materials also compared the proprietary indices' performance to lower-performing, non-proprietary indices like the Standard & Poor's 500 and Russell 1000. These comparisons allegedly created a false choice, incentivizing consumers to allocate their premiums to Security Benefit's proprietary indices. Plaintiffs claim Security Benefit's misleading representation that the proprietary indices were uncapped and had a 100% participation rate further heightened the contrast between the proprietary and non-proprietary indices' performance.

## 2. *Statements of Understanding*

A Statement of Understanding is a document Security Benefit provided to the consumer at the time of sale that describes the annuity product and its features. Security Benefit required the purchaser of an annuity product to sign a Statement of Understanding; these documents were also available to consumers online. According to Plaintiffs, the Statements of Understanding made material misrepresentations and omitted material facts about the proprietary indices.

For example, the Statement of Understanding about the "5-Year Annuity Linked TV Index" ("ALTV Index") did not disclose how various features of the Total Value Annuity offset the ALTV Index's below-market returns and negatively affected the ALTV Index's performance. The ALTV Index Statement of Understanding also did not disclose that the Index was designed using a selective, backcasted performance period. Along with these omissions, the ALTV Index Statement of Understanding allegedly misrepresented the benefits of the volatility control overlay. According to Plaintiffs, the volatility control overlay actually worked to reduce the proprietary indices' participation rates. Security Benefit further misrepresented investors would benefit from allocating their premiums to the ALTV Index because it was not tied to equity and bond markets—but this actually reduced investors' returns.[5]

### D. Procedural History

In November 2019, Plaintiff Clinton sued Security Benefit on behalf of herself and others similarly situated in federal district court in the Southern District of Florida. Plaintiff Clinton alleged Security Benefit devised a fraudulent scheme to develop and sell equity-indexed deferred annuities that it knew would produce near-zero returns for consumers and relied on allegedly

---

[5] The complaint makes similar allegations about other Statements of Understanding provided to Plaintiffs, which also contained misrepresentations or omissions about the proprietary indices.

deceptive marketing practices to induce consumers to purchase these annuity products. *See generally* Class Action Complaint, *Clinton* v. *Sec. Benefit Life Ins. Co.*, 519 F. Supp. 3d 943 (D. Kan. 2021) (Case No. 5:20-cv-0438-HLT-KGG), ECF No. 1. The company linked the annuities' performance to recently created, synthetic proprietary indices instead of to traditional markets like the Standard & Poor's 500. To fraudulently induce consumers' purchase of the annuity products, Security Benefit used marketing materials and the Statements of Understanding that contained misrepresentations and omissions about how the proprietary indices operated and were expected to perform. Security Benefit's alleged conduct, Plaintiff Clinton claimed, violated RICO, 18 U.S.C. § 1962(c) and (d). Plaintiff Clinton alleged the annuity products' costs, fees, and "performance dampening features" operated collectively to offset the proprietary indices' returns, and that Security Benefit did not disclose the "collective impact" of these features on consumers' investments. Class Action Complaint, *Clinton*, 519 F. Supp. 3d 943, ECF No. 1 at 23 ¶ 81.

In January 2020, Plaintiffs amended their complaint to add additional plaintiffs and claims under RICO, 18 U.S.C. § 1962(c) and (d), along with consumer protection, unfair competition, and common law fraud claims under California, Illinois, Arizona, and Nevada state law. *See* Aplt. App. vol. 1 at 155.

Security Benefit moved to dismiss, contending the complaint failed to plead plausible fraud claims with particularity.[6] Aplt. App. vol. 7 at 1870-78. This action was then transferred to the District of Kansas under 28 U.S.C. § 1404.[7] In February 2021, the district court dismissed the complaint without prejudice.[8] Aplt. App. vol. 8 at 1972-73. This timely appeal followed.

---

[6] Security Benefit also argued in its motion to dismiss that the McCarran-Ferguson Act barred Plaintiffs' RICO claims. The district court concluded the McCarran-Ferguson Act did not reverse-preempt Plaintiffs' RICO claims. The district court's ruling on this issue is not before us on appeal.

[7] Security Benefit asked to transfer the case to federal district court in Kansas, contending that was a more convenient forum. The district court granted the motion because the lawsuit could originally have been brought in the District of Kansas, for the "convenience of the parties and witnesses" and "in the interest of justice." R. & R. on Def.'s Mot. to Transfer, *Clinton*, 519 F. Supp. 3d 943 (Case No. 5:20-cv-0438-HLT-KGG), ECF No. 73 at 3 (citing 28 U.S.C. § 1404(a)); Order, ECF No. 75 (adopting magistrate judge's report and recommendation to transfer).

[8] In 2019, the district court dismissed an action by a different named plaintiff alleging RICO claims against Security Benefit. *See Ogles* v. *Sec. Benefit Life Ins. Co.*, 401 F. Supp. 3d 1210 (D. Kan. 2019). There, the district court concluded the plaintiff's "RICO theory alleging the fraudulent design of the [Total Value Annuity] is dismissed for failure to state a claim under Rule 12(b)(6)," *id.* at 1213, because the plaintiff had "not pleaded mail and wire fraud with sufficient particularity to state a valid RICO claim," *id.* at 1228 n.21. The plaintiff in *Ogles* did not appeal the dismissal order.

## II

## Discussion

### A. Appellate Jurisdiction

We must first determine whether the dismissal of the complaint without prejudice was a "final decision" over which we have appellate jurisdiction. *See* 28 U.S.C. § 1291. "Although neither party challenges our appellate jurisdiction, we have an independent duty to examine our own jurisdiction." *Amazon, Inc.* v. *Dirt Camp, Inc.*, 273 F.3d 1271, 1274 (10th Cir. 2001) (citation omitted).

"A dismissal of the complaint is ordinarily a non-final, nonappealable order (since amendment would generally be available), while a dismissal of the entire action is ordinarily final." *Moya* v. *Schollenbarger*, 465 F.3d 444, 449 (10th Cir. 2006) (citation omitted). We scrutinize complaint dismissals "to pinpoint those situations wherein, in a practical sense, the district court by its order has dismissed a plaintiff's action as well." *Id.* (citation omitted). In doing so, we "look to the substance and objective intent of the district court's order, not just its terminology." *Id.* (emphasis omitted).

The district court did "not grant leave to amend" and dismissed the complaint "without prejudice." Aplt. App. vol. 8 at 1972 n.14. It then entered judgment and "closed" the case. *Id.* at 1974. A dismissal without prejudice is "usually not a final decision." *Amazon*, 273 F.3d at 1275. But as Plaintiffs

correctly contend, a dismissal without prejudice may be a final decision where the district court dismisses the action as well. *See Moya*, 465 F.3d at 449. Here, the district court denied leave to amend, entered judgment for Security Benefit, and closed the case. Under the circumstances, this indicates the district court's objective intent to dismiss the entire action. *See id.* at 448-49; *accord Lewis* v. *Clark*, 577 F. App'x 786, 792 (10th Cir. 2014) (unpublished) (holding that order dismissing a complaint without prejudice for failure to state a claim was a final dismissal of the action because the court did not grant leave to amend and declared "this case is closed"). We thus conclude the order dismissing the complaint without prejudice disposed of the entire action and rendered the decision final under § 1291. We have jurisdiction and proceed to the merits.

**B. The district court erred in dismissing the complaint.**

The district court dismissed Plaintiffs' complaint on two grounds; both are challenged in this appeal. First, we consider the district court's conclusion that the complaint did not satisfy Federal Rule of Civil Procedure 9(b)'s particularity standard. We next consider the district court's conclusion that Plaintiffs' claims were implausible under Federal

Rule of Civil Procedure 12(b)(6).[9] As we explain, we agree with Plaintiffs that the district court committed reversible error.

### 1. Standard of Review

We review de novo the dismissal of a complaint under Rule 12(b)(6). *Childs* v. *Miller*, 713 F.3d 1262, 1264 (10th Cir. 2013). "The dismissal of a complaint . . . for failing to satisfy the requirements of Rule 9(b) is treated as a dismissal for failure to state a claim" under Rule 12(b)(6). *Seattle-First Nat'l Bank* v. *Carlstedt*, 800 F.2d 1008, 1011 (10th Cir. 1986) (citation omitted).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege facts that, if true, "state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). We have explained that, when *Iqbal* speaks of a claim's facial plausibility, the complaint must plead "factual content that allows the court to draw the reasonable inference that the

---

[9] We have never prescribed an order-of-operations for the analysis of fraud-based claims under Rules 9(b) and 12(b)(6), nor would it be prudent to do so. But here, where a plaintiff must plead "with particularity the circumstances constituting" the predicate acts of mail and wire fraud, *see* Fed. R. Civ. P. 9(b), we first determine if the complaint has satisfied Rule 9(b), and if so satisfied, we next consider, on the basis of the particularized allegations, whether the complaint alleges a facially plausible claim for relief, *see Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

defendant is liable for the misconduct alleged." *Hogan* v. *Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

In reviewing an order granting a motion to dismiss, our role is like the district court's: we accept the well-pleaded facts alleged as true and view them in the light most favorable to the plaintiff, *see Mayfield* v. *Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016), but need not accept "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678 (citation omitted), or allegations plainly contradicted by properly considered documents or exhibits, *Farrell-Cooper Mining Co.* v. *U.S. Dep't of the Interior*, 728 F.3d 1229, 1237 n.6 (10th Cir. 2013).[10] "An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any

---

[10] The dissent appears convinced this case can be decided by identifying what it believes to be contradictions between "the contents of the sales documents" and the "specific allegations of the complaint." Dissent at 2. We reiterate our agreement, as a general matter, that courts need not accept "allegations that contradict a properly considered document." *Farrell-Cooper*, 728 F.3d at 1237 n.6 (citation omitted). We disagree, however, with the dissent's suggestion this principle is dispositive *in this case*. This is not, for example, *Kramer* v. *Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991), cited as analogous by the dissent at 2. There, the complaint alleged that the proposed merger consideration was said to "consist of cash, at least in part." 937 F.2d at 775. However, when reviewing the actual offer to purchase, the Second Circuit found the document "stated that the consideration would consist of 'cash *or* debt *or* equity securities.'" *Id.* (emphases added). There was thus a plain contradiction between what the complaint alleged and what the document said—one we cannot discern in this case, as we will explain.

factual enhancement." *Brooks* v. *Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citation omitted). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC* v. *Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (citation omitted). Our task is to consider the complaint's allegations "taken as a whole." *U.S. ex rel. Lemmon* v. *Envirocare of Utah, Inc.*, 614 F.3d 1163, 1173 (10th Cir. 2010) (citation omitted); *see also Twombly*, 550 U.S. at 569 n.14; *George* v. *Urb. Settlement Servs.*, 833 F.3d 1242, 1257 (10th Cir. 2016); *cf. In re Hain Celestial Group, Inc. Securities Litigation*, 20 F.4th 131, 137-38 (2d Cir. 2021) (directing district court to "consider cumulative effect of the circumstantial allegations" when weighing scienter in securities fraud case).

And like the district court, we may consider certain documents outside the four corners of the complaint. *See, e.g.*, *Smith* v. *United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted). "Generally, a court considers only the contents of the complaint when ruling on a 12(b)(6) motion," but "[e]xceptions to this general rule include the following: documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes its authenticity; and

'matters of which a court may take judicial notice.'" *Berneike* v. *CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013) (citation omitted).[11]

"[G]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias* v. *City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (second alteration in original) (citation omitted). There is a "low bar for surviving a motion to dismiss," *Quintana* v. *Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020), and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely,'" *Dias*, 567 F.3d at 1178 (quoting *Twombly*, 550 U.S. at 556); *see also Woods* v. *City of Greensboro*, 855 F.3d 639, 652 (4th Cir. 2017) ("Whether [a plaintiff] will have a difficult time establishing the merits of its claim is of little import now.").[12]

---

[11] At the request of the parties, the district court took judicial notice of certain documents under Federal Rule of Evidence 201 that were referenced in the complaint or publicly accessible and of undisputed authenticity. We conclude all of the judicially noticed documents considered by the district court fall appropriately within the four "exceptions" contemplated by *Berneike*, 708 F.3d at 1146, and the parties have never argued otherwise. Accordingly, we will consider the judicially noticed materials in our review of the dismissal order.

[12] Besides acknowledging "the long-established proposition that on a motion to dismiss a complaint the court should accept as true all well-pleaded factual allegations in the complaint," the dissent does not engage

### 2. The district court erred in dismissing the complaint for failing to satisfy Rule 9(b)'s particularity standard.

Plaintiffs allege Security Benefit violated the federal RICO statute, which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

---

with the standards on a motion to dismiss. Dissent at 1. Perhaps this leads the dissent to a misimpression about the court's opinion. For example:

- We *do not* "accept specific allegations of the complaint as gospel." Dissent at 2. In reviewing the motion to dismiss, we *do* accept well-pled allegations as true and draw reasonable inferences in favor of the Plaintiffs, as the Federal Rules and our precedents command.

- We *do not* accept "Plaintiffs' allegations . . . that Security Benefit's backcasting was deceptive." Dissent at 4. We *do* conclude these arguments were advanced with legal sufficiency while declining "to weigh potential evidence that the parties might present at trial." *Peterson* v. *Grisham*, 594 F.3d 723, 727 (10th Cir. 2010).

- And we *do not* "endorse[] the complaint's allegation that Security Benefit was deceptive in stating that its investment products are not capped." Dissent at 6. We *do* find Plaintiffs' complaint advanced sufficient "[f]actual allegations . . . to raise the right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

The dissent's disagreement with the disposition appears to rest in good measure on conjecture that Plaintiffs will be unable to prove their claims. But the ultimate merits of Plaintiffs' case is not the question before us. Rule 9(b) demands "particularity," not proof. Fed. R. Civ. P. 9(b). And at the motion to dismiss stage, we are assessing the complaint only for legal sufficiency to state a claim, which means we do not "weigh potential evidence that the parties might present at trial." *Smith*, 561 F.3d at 1098.

conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

According to Plaintiffs, Security Benefit committed mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343. There is no dispute both mail and wire fraud are racketeering activities under RICO. *See* 18 U.S.C. § 1961(1)(B) (defining "racketeering activity" to include violations of 18 U.S.C. §§ 1341 and 1343). Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "The particularity requirement of Rule 9(b) . . . applies to claims of mail and wire fraud." *Tal* v. *Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006); *accord George*, 833 F.3d at 1254. Therefore, as the district court correctly determined, Plaintiffs must plead "with particularity the circumstances constituting" Security Benefit's alleged mail and wire fraud. Fed. R. Civ. P. 9(b).

"Rule 9(b)'s purpose is 'to afford [a] defendant fair notice' of a plaintiff's claims and the factual grounds supporting those claims." *George*, 833 F.3d at 1255 (alteration in original) (citation omitted). "[T]he most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b) . . . is the determination of how much detail is necessary to give adequate notice to an adverse party and enable that party to prepare a responsive pleading." *Lemmon*, 614 F.3d at 1172

(second alteration in original) (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298 (4th ed. 2022)).[13]

We have held that, to adequately plead mail and wire fraud under Rule 9(b), Plaintiffs must allege "the time, place and contents of the false representations, the identity of the party making the false statements, and the consequences" of the false representations. *George*, 833 F.3d at 1254 (quoting *Koch* v. *Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000)); *accord Tal*, 453 F.3d at 1265 (complaint satisfied Rule 9(b) when it "identified the parties, the dates, the content of the communications, [and] how they were allegedly fraudulent"). Put differently, a complaint stating the "who, what, where, when, and how" of the alleged fraud gives a defendant the requisite level of notice required under Rule 9(b).

The district court determined Plaintiffs' fraud allegations were not sufficiently particularized, concluding, "[a]lthough the first amended complaint expounds at length on Plaintiffs' theory that [Security Benefit] fraudulently developed and marketed the equity-indexed annuities while using the mail and wires, less prevalent are any specific details of the 'time,

---

[13] Security Benefit claims *Lemmon* is inapposite because it involves the "unique" setting of the False Claims Act ("FCA"). We are not persuaded. While *Lemmon* applied Rule 9(b) in the context of FCA claims, our Rule 9(b) analysis was not *limited* to a specific statutory context and applies with equal force here. *See Lemmon*, 614 F.3d at 1171-72.

place and contents of the false representation[s].'" Aplt. App. vol. 8 at 1964 (alteration in original) (quoting *George*, 833 F.3d at 1254). On appeal, Plaintiffs contend the district court erred because the complaint states sufficient factual content to satisfy Rule 9(b)'s pleading standard. Reviewing de novo, we agree.[14]

Plaintiffs allege Security Benefit fraudulently misrepresented the attributes and performance of its proprietary indices using the marketing materials and Statements of Understanding.[15] Regarding the "who" and

---

[14] Security Benefit insists Plaintiffs seek the application of a relaxed particularity standard. Aplee. Br. at 46. That is not how we read the arguments on appeal. In any event, our law concerning Rule 9(b)'s pleading standard is settled, and we apply it here. *See George*, 833 F.3d at 1254.

[15] Plaintiffs contend for the first time on appeal that Security Benefit's policy contracts are themselves misleading. Aplt. Br. at 18. The record confirms Plaintiffs never alleged Security Benefit made misrepresentations in the policy contracts, in addition to in their marketing materials and Statements of Understanding. *See* Aplt. App. vol. 7 at 1892 n.2. For example, in opposing Security Benefit's motion to dismiss in the district court, Plaintiffs said "[we] do not challenge the validity of or representations in the policy contracts themselves. Instead, Plaintiffs allege that the . . . marketing materials, sales illustrations and [Statements of Understanding] are false and misleading because they contain half-truths and omit material facts." *Id.* at 1892 n.2. By asking this court to proceed in the face of such inconsistency, Plaintiffs seem to invite error. *See John Zink Co.* v. *Zink*, 241 F.3d 1256, 1259 (10th Cir. 2001) (concluding the invited error doctrine applied where appellants' argument was "a complete reversal from the position they asserted" below, and therefore appellants could not seek "reversal on the ground that the requested action was error" (citation omitted)). Under these circumstances, we do not reach Plaintiffs' first-instance appellate argument concerning the policy contracts.

"when" of the alleged fraud, the complaint states Security Benefit delivered the Statements of Understanding to purchasers of the annuity products and required purchasers to sign the Statements with the insurance agent who made the sale. Documents central to Plaintiffs' claims, incorporated by reference in the complaint, are fully consistent with this allegation. These documents show the specific date when each Plaintiff signed their Statement of Understanding, along with the signatures of the individual agents who secured the annuity products' sale.

The district court concluded Plaintiffs failed to set forth particularized details of when Security Benefit made the allegedly false representations. But the district court did not account for the specific dates in the Statements of Understanding—documents it had judicially noticed because Plaintiffs "explicitly reference[d]" the Statements throughout their complaint, and because the Statements are central to Plaintiffs' claims. Aplt. App. vol. 1 at 252, vol. 8 at 1950. The dates in the Statements of Understanding are consistent with the allegations in the complaint concerning when Security Benefit allegedly induced each Plaintiff to purchase the annuity products. The complaint also details that Security Benefit created the allegedly misleading Statements of Understanding, and the marketing materials, and controlled the dissemination of these documents. *See Schwartz* v. *Celestial Seasonings, Inc.*, 124 F.3d 1246, 1253

(10th Cir. 1997) ("Rule 9(b) requires that a complaint set forth the identity of the party making the false statements" and "give notice to the defendants of the fraudulent statements for which they are alleged to be responsible." (citations omitted)).

As to "where" Security Benefit's allegedly false representations were made, Plaintiffs allege Security Benefit induced them to purchase its annuity products using its allegedly misleading sales documents and Statements of Understanding at the point of sale in specific locations— namely, Florida, California, Illinois, Arizona, and Nevada. And the complaint alleges Security Benefit's misrepresentations were found in its marketing materials and the Statements of Understanding that Plaintiffs signed. *See id.* at 1252 (concluding a complaint "adequately identifie[d] the time, place, and contents" of allegedly fraudulent statements by identifying "the documents, press releases, and other communications which contain[ed] the statements"); *see also Cooper* v. *Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (determining plaintiffs' complaint identified the "where" for Rule 9(b) by alleging fraudulent statements were made in quarterly financial statements). At Security Benefit's request, the district court properly took judicial notice of the marketing brochures because those brochures were referenced in the complaint. *See* Aplt. App. vol. 1 at 252-53 (stating in request for judicial notice that "Plaintiffs' [complaint] also

references and cites directly to the marketing brochures for each of the three indices" and that the "TVBI Brochure . . . was a marketing brochure allegedly presented at the point of sale to [one plaintiff] . . . and it is referenced in the [complaint]").

The complaint also sufficiently identifies the "what" and the "how"—the content of Security Benefit's Statements of Understanding and marketing materials and in what way they were allegedly fraudulent.[16] *See, e.g.*, *Tal*, 453 F.3d at 1265 (finding complaint which "identified the parties, the dates, the content of the communications, how they were allegedly fraudulent and how they furthered the fraudulent enterprise" satisfied Rule 9(b)). For instance, the complaint alleges Security Benefit represented the proprietary indices were uncapped and had a 100% participation rate.

---

[16] The dissent has concluded Plaintiffs' allegations lack merit and finds "there is nothing false or misleading about the . . . sales documents." Dissent at 3. But the "bedrock principle" at this stage is "that a judge ruling on a motion to dismiss must accept all allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven." *Robbins* v. *Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). Indeed, where, as here, the plausibility and particularity pleading standards are satisfied, "[a] Rule 12(b)(6) motion to dismiss is not a suitable procedure for determining that these documents could not *possibly* have been misleading." *Bible* v. *United Student Aid Funds, Inc.*, 799 F.3d 633, 658 (7th Cir. 2015) (emphasis added) (holding plaintiff in civil RICO case plausibly alleged mail and wire fraud for purposes of Rule 12(b)(6); though company's written communications might be literally true, they could be misleading where additional information was concealed or where the language in the written materials "could reasonably be understood as implying" something other than the disclosed information itself).

But this is misleading, Plaintiffs have pleaded, because Security Benefit failed to disclose the cumulatively negative effect—the "collective impact"—of the annuity products' so-called "performance dampening features." *See* Aplt. App. vol. 1 at 185 ¶ 89. The complaint also alleges Security Benefit failed to disclose how the volatility control overlay worked in practice to reduce participation rates. Plaintiffs detail how Security Benefit used backcasted historical data to create hypothetical illustrations projecting the proprietary indices' future gains. However, this data—and the future returns the data projected—were misleading because, as Plaintiffs allege, Security Benefit used "cherry-picked" performance periods that exhibited non-representative gains for the proprietary indices. *Id.* at 174 ¶ 64. According to Plaintiffs, Security Benefit also assumed a 100% participation rate over the backcasted period, which was misleading because it was impossible for 100% of the gain in the index to be credited to the annuity during that period.

Plaintiffs also have alleged, as they must, the "injuries they suffered as a result" of Security Benefit's fraudulent misrepresentations. *George*, 833 F.3d at 1256. For instance, Plaintiff Clinton purchased five Total Value Annuities for $100,000 each, then allocated all $500,000 of her investment to Security Benefit's proprietary "BNP Paribas High Dividend Plus Annual Point to Point Index Account – Year 2" ("BNP Index"). She was credited at

26

the end of a two-year annuity period with 0.00% interest. She also lost the use of her $500,000 investment allocated to the BNP Index. Plaintiff Clinton suffered additional harm because her annuities were allegedly worth less than what she paid for them on the day they were issued to her. The complaint contains similar allegations about the harm sustained by the remaining Plaintiffs. Except for Plaintiff Rosen, who received 1.68% interest on his investment from the "Morgan Stanley Dynamic Allocation Index Account" ("Morgan Stanley Index"), all Plaintiffs received 0.00% interest at the end of their annuity periods for the investments they made in annuity products linked to the proprietary indices used by Security Benefit.

Not all Plaintiffs' allegations satisfy Rule 9(b), however. While the complaint specified with particularity when Security Benefit allegedly made misrepresentations in the Statements of Understanding, the same cannot be said of misrepresentations made in the marketing materials, except for one allegation regarding a sales illustration prepared for Plaintiff Webber on April 22, 2014. *See Koch*, 203 F.3d at 1237 (determining alleged misrepresentations made "during 1982 and continuing to the present time" did not "alert the [d]efendants to a sufficiently precise time frame to satisfy Rule 9(b)").

But, as we have previously recognized, not every allegation of fraudulent misconduct must be pleaded with particularity for a complaint to survive at the motion to dismiss stage. *See George*, 833 F.3d at 1257. In *George*, some allegations only "generally allege[d]" that one plaintiff "sometimes on specific dates, made phone calls to [a defendant], [and] spoke with unidentified [defendant] employees who made false representations to him via phone" and "through the mail." *Id.* at 1255. We concluded these "general allegations" did not suffice under Rule 9(b). *Id.* at 1256. However, other allegations were sufficiently particular because, for instance, they identified a defendant's employees "by name," specified "the dates when those employees made allegedly false statements, identif[ied] the actions the plaintiffs took in reliance on those misrepresentations, [and] detail[ed] the injuries they suffered as a result." *Id.*

Under those circumstances, we concluded that even where "not *all* of the plaintiffs' allegations" are pleaded with particularity, *id.* at 1255 (emphasis added), a complaint may nonetheless satisfy Rule 9(b)'s requirements when its allegations are sufficiently particularized when "*taken as a whole*," *id.* at 1257 (emphasis added) (citation omitted). So too here. *George* teaches that, in evaluating the particularity of fraud allegations under Rule 9(b), we must ask whether the complaint, taken as a whole, "sufficiently apprise[s]" the defendant of its involvement in the

alleged fraudulent conduct. *Id.* (citation omitted); *see also U.S. ex rel. Heath* v. *AT & T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015) ("Rule 9(b) does not inflexibly dictate adherence to a preordained checklist of 'must have' allegations."). Here, reviewing de novo, and reading the complaint in its entirety, we conclude that it does. Plaintiffs have satisfied Rule 9(b)'s requirements, and the district court erred in concluding otherwise.

*3. The district court also erred in dismissing the complaint for failing to allege facially plausible claims for relief.*

We next consider whether Plaintiffs have stated facially plausible fraud claims. *See Iqbal*, 556 U.S. at 678. Rule 9(b) needs to be read harmoniously with the rules of notice pleading. Although Plaintiffs' allegations are sufficiently particularized under Rule 9(b), the complaint must also include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted); *see also* Wright & Miller, *supra* ("[O]ne cannot focus exclusively on the fact that Rule 9(b) requires particularity in pleading the circumstances of fraud without taking account . . . the strictures of plausibility pleading.") (footnote omitted). Facial plausibility means the complaint must offer sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Llacua* v. *W. Range Ass'n*, 930 F.3d 1161, 1177 (10th Cir. 2019) ("The

question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff may obtain relief." (citation omitted)).

The district court determined the complaint "lack[ed] plausibility" because Plaintiffs failed to set forth "sufficient facts from which an inference of fraud can be drawn." Aplt. App. vol. 8 at 1965. In making its determination, the district court focused primarily on four alleged misrepresentations and omissions:

- "[T]he annuities were 'uncapped' and had 100% participation" rates, *id.* at 1966;

- Security Benefit used "backcasting" to create "hypothetical illustrations projecting the performance" of the proprietary indices, *id.* at 1967;

- "[T]hat [Security Benefit] . . . 'misleadingly suggest[ed] that the volatility control overlay ha[d] a symmetrical impact on performance'" of the proprietary indices "when it did not," *id.* at 1969 (quoting Aplt. App. vol. 1 at 186 ¶ 92);

- Security Benefit failed "to disclose the composition of assets in the ALTV Index and BPHD [BNP] Index." *Id.* at 1970.

Plaintiffs argue the district court erred in its ultimate conclusion and engaged in a flawed analysis by considering only a handful of allegations in isolation, failing to account for—or understand—the gist of the alleged fraudulent scheme. Security Benefit insists the district court "thoroughly examined" the complaint and addressed in "painstaking detail" the four alleged misrepresentations and omissions "at the heart of the alleged fraudulent scheme." Aplee. Br. at 27. Guided by a methodical application of

the standard of review, we agree with Plaintiffs. Accepting the well-pleaded facts alleged as true and viewing them in the light most favorable to Plaintiffs, we conclude the complaint's particularized allegations plausibly allege Security Benefit engaged in a fraudulent scheme.

"In order to bring a [civil] RICO claim, a plaintiff must allege a violation of 18 U.S.C. § 1962, which consists of four elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Gillmor* v. *Thomas*, 490 F.3d 791, 797 (10th Cir. 2007) (quoting *Sedima, S.P.R.L.* v. *Imrex Co.*, 473 U.S. 479, 496 (1985)). "To establish a pattern of racketeering activity, [Plaintiffs] must allege at least two predicate acts." *George*, 833 F.3d at 1254; *accord Deck* v. *Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003) ("A pattern of racketeering activity must include commission of at least two predicate acts." (citation omitted)); *see also Safe Streets All.* v. *Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017) ("The [civil RICO] statute defines 'racketeering activity' to encompass dozens of state and federal offenses, known in RICO parlance as predicates." (citation omitted)). Recall that mail and wire fraud—the claims alleged here—are predicate racketeering activities under RICO. *See* 18 U.S.C. § 1961(1)(B); *see also George*, 833 F.3d at 1254 ("As defined in 18 U.S.C. § 1961(1)(B), 'racketeering activity' includes indictable acts of mail and wire fraud as prohibited under 18 U.S.C. §§ 1341 and 1343, respectively."); *Bridge* v.

*Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) ("The term 'racketeering activity' is defined to include a host of so-called predicate acts, including 'any act which is indictable under . . . section 1341 (relating to mail fraud).'" (alteration in original) (quoting § 1961(1)(B))); *CGC Holding Co.* v. *Broad & Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014) ("Section 1961(1)(B) describes the qualifying 'racketeering activities,' or 'predicate acts,' which include wire fraud.").

To state a claim for mail and wire fraud, Plaintiffs must "plausibly allege 'the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises.'" *George*, 833 F.3d at 1254 (citation omitted); *see also United States* v. *Zar*, 790 F.3d 1036, 1050 (10th Cir. 2015) ("[T]his court has recognized that the first two elements of the mail fraud statute and the wire fraud statute [a scheme and intent to defraud], §§ 1341 and 1343, are identical." (citation omitted)).[17]

_____

[17] Here, Plaintiffs allege Security Benefit violated the federal mail and wire fraud statutes to "effectuate their scheme." Aplt. App. vol. 1 at 208 ¶ 163. In assessing Security Benefit's alleged mail and wire fraud in the civil RICO context, we look to criminal law for general guidance in interpreting the elements of these predicate offenses. *See, e.g.*, *Bridge*, 553 U.S. at 647 ("The term 'racketeering activity' [in § 1962(c)] is defined to include a host of so-called predicate acts, including [mail fraud]. . . . The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element.'") (quoting *Schmuck* v. *United States*, 489 U.S. 705, 712 (1989)); *see also Sorensen* v. *Polukoff*, 784 F. App'x 572, 577 (10th Cir. 2019) (unpublished) (stating that in review of the dismissal of a civil RICO action "[t]he elements

"[T]he central focus of the first element [of mail and wire fraud] is the existence of a scheme." *United States* v. *Kennedy*, 64 F.3d 1465, 1475 (10th Cir. 1995) (citation omitted); *see also United States* v. *Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003) ("The gist of [mail and wire fraud] is a scheme to defraud and the use of interstate communications to further that scheme." (citation omitted)). "A 'scheme or artifice to defraud' 'connotes a plan or pattern of conduct which is intended to or is reasonably calculated to deceive persons of ordinary prudence and comprehension.'" *United States* v. *Hanson*, 41 F.3d 580, 583 (10th Cir. 1994) (citation omitted); *accord Welch*, 327 F.3d at 1106; *see also Zar*, 790 F.3d at 1050 ("[T]he first element of wire [and mail] fraud is a scheme to defraud and that element includes a scheme to obtain property by means of false or fraudulent pretenses, representations, or promises . . . .").

"[I]ntent to defraud" under §§ 1341 and 1343, the second element of a mail and wire fraud scheme, may be established "by various means." *Welch*, 327 F.3d at 1106; *see also Carpenter* v. *United States*, 484 U.S. 19, 27 (1987) ("Sections 1341 and 1343 reach any scheme to deprive another of money or

---

of mail fraud under 18 U.S.C. § 1341 are '(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of the mails to execute the scheme.'" (footnotes omitted) (quoting *United States* v. *Zander*, 794 F.3d 1220, 1226 (10th Cir. 2015))).

property by means of false or fraudulent pretenses, representations, or promises."). For instance, we have held that a scheme to defraud may involve the use of "material misrepresentations," *United States* v. *Schuler*, 458 F.3d 1148, 1153 (10th Cir. 2006), or "knowledge of a false statement," *United States* v. *Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003); *accord United States* v. *Kalu*, 791 F.3d 1194, 1205 (10th Cir. 2015) (determining that "[i]ntent to defraud" under § 1341 "may be inferred from the defendant's misrepresentations [or] knowledge of a false statement" (citations omitted)). Not every scheme to defraud will involve an affirmative falsehood. *See United States* v. *Gallant*, 537 F.3d 1202, 1228 (10th Cir. 2008) ("A scheme to defraud focuses on the intended end result and affirmative misrepresentations are not essential . . . ." (citation omitted)); *Kemp* v. *Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1359 (11th Cir. 2004) ("[I]t is not necessary for a plaintiff to point to affirmative misstatements in order to establish the requisite fraudulent intent of a defendant under the mail and wire fraud statutes." (citation omitted)); *Kehr Packages, Inc.* v. *Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) ("The [mail fraud] scheme need not involve affirmative misrepresentation . . . ." (citation omitted)).

"[A] misleading omission" also may establish the intent to defraud under the mail and wire fraud statutes. *United States* v. *Cochran*, 109 F.3d 660, 665 (10th Cir. 1997) (citation omitted); *see also Gallant*, 537 F.3d

at 1228 ("Fraudulent intent is required under the statute, and 'deceitful concealment of material facts may constitute actual fraud.'" (citation omitted)). A fiduciary relationship between parties "can trigger a duty of disclosure as can some other relationship of trust and confidence between the parties," and when such a relationship exists "certain people must always disclose facts where nondisclosure could result in harm." *Cochran*, 109 F.3d at 665 (citations omitted). But "[e]ven apart from a fiduciary duty . . . 'a misleading omission[] is actionable as fraud'" under the mail and wire fraud statutes "if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." *Id.* (second alteration in original) (citation omitted); *see also United States* v. *Allen*, 554 F.2d 398, 410 (10th Cir. 1977) ("While the existence of a fiduciary duty is relevant and an ingredient in some mail fraud prosecutions, it is not an essential in all such cases. . . . [F]raudulent representations . . . may be effected by deceitful statements of half-truths or the concealment of material facts . . . ." (footnote omitted) (citations omitted)).[18]

---

[18] The dissent claims the majority "adopts unprecedented notions of fraud." Dissent at 1. We see nothing threateningly novel about Plaintiffs' allegations.

Plaintiffs claim Security Benefit committed both mail and wire fraud, which are predicate racketeering activities under RICO. "RICO is to be read

Here, Plaintiffs claim reversal is required because the district court misconstrued the four misrepresentations and omissions it specifically analyzed and ignored other related allegations. *See, e.g.*, Aplt. Br. at 46. Plaintiffs contend the complaint sufficiently pleads Security Benefit

---

broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.' The statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Sedima*, 473 U.S. at 497-98 (quoting Pub. L. 91-452, § 904(a), 84 Stat. 947); *see also Safe Streets All.*, 859 F.3d at 881, 885 (discussing RICO's civil remedies and rejecting the notion of any "hidden . . . *pleading* requirement").

Plaintiffs allege Security Benefit, in its marketing materials and Statements of Understanding, materially misrepresented the "performance dampening features" of its annuity products and failed to disclose the collective impact of these features on Plaintiffs' investments. A fraud claim is *plausible* under these circumstances. *See* Restatement (Second) of Torts § 529 ("A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent representation."); *see also id.* cmt. b ("Whether or not a partial disclosure of the facts is a fraudulent misrepresentation depends upon whether the person making the statement knows or believes that the undisclosed facts might affect the recipient's conduct in the transaction at hand. It is immaterial that the defendant believes that the undisclosed facts would not affect the value of the bargain which he is offering."); *cf. Miller* v. *Thane Intern., Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (holding, in the securities fraud context of § 12(a)(2) of the Securities Act of 1933, that "statements literally true on their face may nonetheless be misleading when considered in context"); *McMahan & Co.* v. *Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (recognizing, for purposes of disclosure requirements under the federal securities laws, "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors").

induced Plaintiffs to purchase the annuity products through "materially false and misleading representations and half-truths." Aplt. App. vol. 1 at 159 ¶ 9. According to Plaintiffs, the complaint, when taken as a whole, plausibly alleges Security Benefit engaged in a scheme to defraud by materially misrepresenting the "performance dampening features" of its annuity products and failing to disclose the collective impact of these features on Plaintiffs' investments. *Id.* at 185 ¶ 89. We agree. The district court failed to consider the complaint as a whole, *see Lemmon*, 614 F.3d at 1173, and its analysis of the four misrepresentations and omissions in isolation reveals it did not fully account for Security Benefit's misrepresentations about the discrete features of the annuity products that, together, operated to reduce the proprietary indices' performance. We now turn to the district court's analysis of each allegation it considered and explain why the court erred.

      a. *"Uncapped" Annuity Products & 100% Participation Rates*

The district court focused first on the alleged misrepresentations made by Security Benefit about the "uncapped" annuity products with 100% participation rates in the proprietary indices. Plaintiffs failed to allege the annuities were "capped," the district court reasoned, so the complaint was "not clear on how" statements about the caps and 100% participation rates "are misleading." Aplt. App. vol. 8 at 1966. But Plaintiffs never alleged that

Security Benefit *actually* capped its annuity products because that was not the problem. Aplt. Br. at 49. Rather, it was Security Benefit's use of "uncapped" terminology without additional disclosures that was misleading.

Advertised claims that an annuity offers "uncapped" rates of return could falsely create inflated consumer expectations of future performance. Here, the complaint alleged that, when marketing the annuity products to Plaintiffs, Security Benefit never disclosed how the annuity products' features, such as the excess return reductions and annual spreads, functioned collectively in practice to reduce the proprietary indices' performance and limit returns. Security Benefit's misrepresentations and omissions about the collective effect of the annuity products' features—which operated in practice as caps and reduced the annuity products' participation rates—were "critical components" of Security Benefit's fraudulent scheme. *Id.* at 45.

For example, while Security Benefit noted that the ALTV Index was based on the Trader Vic Excess Return Index and included a single sentence in the BNP Index brochure explaining the BNP Index was an excess return index, Plaintiffs allege Security Benefit never explained *what* an excess-return index is (i.e., that it subtracts the risk-free rate of return from the index returns). Therefore, the excess-return deductions were

38

undisclosed deductions from the index returns. Any undisclosed deduction from index returns would render misleading a representation that the annuities were uncapped and had 100% participation rates. What the district court found lacking about Plaintiffs' allegations reflected a misunderstanding of this aspect of Plaintiffs' fraud claim.[19]

The district court also determined judicially noticed documents contradicted the allegation that Security Benefit misrepresented the annuity products had a 100% participation rate. According to the district

---

[19] The dissent seems to labor under a similar misunderstanding. At one point, the dissent poses several hypotheticals. One analogizes Security Benefit's alleged activity to credit card marketing: "Is it fraudulent to tout a credit card as offering no monthly fee," the dissent asks, "when the disclosed interest rate is higher than ordinary unless the credit-card company says that there is effectively a monthly fee because the higher interest rate similarly hurts the cardholder financially?" Dissent at 9.

Respectfully, the dissent's hypothetical is not this case. Perhaps somewhat more apposite would be the credit card company that "tout[s] a credit card as offering no monthly fee," but fails to disclose what it might call a "maintenance fee" that will just so happen to be withdrawn from customer accounts twelve times each year.

The dissent also asks whether a car seller is "liable for fraud for failing to say that [a car engine] effectively has [fuel-efficiency reducing] feature A because features B and C reduce the efficiency." Dissent at 9.

Again, we disagree that is the scenario here. More relevant might be the case of a car seller who provides the buyer certain favorable fuel economy numbers on the Monroney label but declines to mention those numbers might be inflated based on its own testing conditions and unlikely to be reproduced in the course of normal driving. *Cf. In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539 (9th Cir. 2019) (en banc).

court, a hypothetical sales illustration prepared for Plaintiff Webber and a Total Value Annuity Statement of Understanding expressly stated the annuity products were guaranteed never to go below a 50% participation rate and thus "belied" Plaintiffs' allegations. Aplt. App. vol. 8 at 1966.[20]

We discern no contradiction between the documents and the allegations.[21] The complaint alleges Security Benefit marketed the annuity products as having a 100% participation rate in the proprietary indices. Plaintiffs further allege that Security Benefit did not disclose how effects of the annuity products' features operated collectively to reduce the participation rate. This means that, notwithstanding what Security Benefit represented to Plaintiffs, the participation rate, in reality, could never be as high as 100%. That the judicially noticed documents promised the participation rate never would go below 50% is not inconsistent with Plaintiffs' allegations that it was misleading for Security Benefit to suggest the participation rate ever could reach 100%. Accordingly, Plaintiffs have pleaded factual content to support the plausibility of the alleged fraudulent

---

[20] Security Benefit identifies similar language in other documents. For example, one Secure Income Annuity Statement of Understanding states "[t]he Current Participation Rate" for the Morgan Stanley Index "is 100%" but that Security Benefit may change the participation rate later. Aplt. App. vol. 7 at 1692.

[21] Nor, therefore, are we persuaded by the dissent's treatment of the same. *See* Dissent at 6.

scheme, including that Security Benefit made "material misrepresentations," *Schuler*, 458 F.3d at 1153, and concealed material facts, *see Gallant*, 537 F.3d at 1228, about the "uncapped" annuity products and their advertised 100% participation rate.

### b. Hypothetical Illustrations & Backcasting

The district court next analyzed the allegations that Security Benefit misled Plaintiffs by using the hypothetical illustrations to project the proprietary indices' potential performance. The complaint alleged these illustrations relied on backcasted performance data, enabling Security Benefit to project misleadingly high future investment returns. The district court concluded Plaintiffs' allegations about backcasted data were implausible. This conclusion was erroneous, as we explain.

First, the district court committed a legal error to the extent it faulted Plaintiffs for failing to identify a false statement in the hypothetical illustrations. Recall, a fraudulent scheme requires a material misrepresentation, *see Schuler*, 458 F.3d at 1153, or the concealment of material facts, *see Gallant*, 537 F.3d at 1228, but "affirmative misrepresentations are not essential," *id.* (citation omitted). Here, the complaint alleges the hypothetical illustrations created a false impression because they were based on backcasted data that selected the proprietary indices' performance periods "to correspond with years when the ind[ices']

41

asset components exhibited non-representative gains." Aplt. App. vol. 1 at 174 ¶ 64. The backcasted data did not derive from the assets' entire performance period but was based only on select periods when the assets performed particularly well. Plaintiffs claim depictions of future performance based on "imaginary," backcasted performance data are misleading. Aplt. Br. at 51. The district court concluded Plaintiffs have done nothing more than simply assert the failure of the hypothetical illustrations' projections to "materialize into actual returns" or "actually come to fruition." Aplt. App. vol. 8 at 1968.[22] We disagree. Plaintiffs have plausibly alleged Security Benefit's hypothetical illustrations were based

---

[22] The district court determined that market conditions could explain why the ALTV Index performed poorly. Plaintiffs argue that, in so concluding, the district court impermissibly drew an inference in favor of Security Benefit. Aplt. Br. at 56. We agree. Even if market conditions ultimately prove explanatory, inference drawing in favor of the defendant is not appropriate at the motion to dismiss stage. The complaint contains allegations explaining why and how Security Benefit designed its proprietary indices to produce near-zero returns. The district court should have accepted the truth of these facts, *see Mayfield*, 826 F.3d at 1255, rather than explained them away in Security Benefit's favor. On appeal, Security Benefit again maintains that market conditions during the relevant period, not any fraudulent scheme, obviously explain why its proprietary indices performed poorly. *See* Aplee. Br. at 33-36. While courts may infer from a complaint's factual content "obvious alternative explanation[s]" for the alleged misconduct, *Iqbal*, 556 U.S. at 682, we do not conclude, under the circumstances here, that generalized "market conditions" are such an obvious alternative explanation for the proprietary indices' poor performance that Plaintiffs' claims are implausible.

on backcasted data that misled investors and induced the purchase of the annuity products.

Notwithstanding the dissent's contrary view, a non-representative backcasting period can be misleading. Recall, a new proprietary index, like those used by Security Benefit, will lack any historical performance. If the index's creator and marketers want to advertise historical performance, they must work backward and calculate what the index's hypothetical value would have been in the past—this is what Plaintiffs call backcasting. So an index will have a launch date, which is the date the index was actually created, but it may also have a backcast period of simulated historical performance before that launch date. An unscrupulous company that wants a lackluster index to have impressive simulated historical performance might choose a backcast period where the index performed particularly well. That the company might include the worst-performing years in such a backcast period does not remedy the problem that the backcast period *as selected* is unrepresentative.

The ten worst-performing years of a period in which the index would have performed very well could still be better than the ten best-performing years of a period in which the index would have performed poorly. In other words, the company's selection of a start and end point is responsible for the relative success of the index presented. An investor looking at these

marketing materials would not know that the backcast period was unrepresentative because it is the only performance data available for the newly created index. When a newly created index is marketed based on a historically unrepresentative, cherry-picked period of performance, that marketing is misleading.

Plaintiffs have plausibly alleged Security Benefit did just that. They alleged one of the proprietary indices had poor performance immediately after exiting the backcast period, which is a characteristic of backcast periods chosen to show abnormally high performance. Aplt. App. vol. 1 at 176 ¶ 67 (ALTV Index declined in five years after plaintiff purchased it); *id.* at 181 ¶ 78) (post-backcast performance of the synthetic indices was near zero); *see also* Aplt. Br. at 22-23 (Citi Equities presentation used ALTV Index as an example of an index that underperformed immediately after exiting backcast period). And the Plaintiffs cited statistical analysis of the assets underlying the indices, which showed their expected returns were near zero and thus, the indices' exceptional performance during the backcast period was unrepresentative. At trial, Plaintiff would need to present evidence to prove these claims—such as expert testimony or documentation about Security Benefit's decisionmaking—but these allegations will survive a motion to dismiss.

Second, the district court concluded the complaint lacked "factual support" for Plaintiffs' allegation that the hypothetical illustrations were based on time periods whose performance could not be reproduced. Aplt. App. vol. 8 at 1968. This is incorrect. The complaint contains multiple allegations describing Security Benefit's "manipulative" backcasting practice. No more factual detail is needed at the motion to dismiss stage to conclude Plaintiffs have plausibly alleged facts supporting an inference of fraud.

Third, the district court determined Plaintiffs' allegations about Security Benefit's misleading backcasted data were "at odds with the underlying theme of Plaintiffs' case—that [Security Benefit] knew the [proprietary indices] would generate 'near-zero returns.'" *Id.* at 1968 (emphasis omitted). Again, we disagree. The complaint sufficiently alleges Security Benefit sold annuity products based on the misleading hypothetical illustrations, which induced consumers to buy products and allocate their premiums to the proprietary indices, even though Security Benefit knew their indices would produce near-zero returns.

Finally, the district court concluded Plaintiff Webber's Total Value Annuity sales illustration contradicted Plaintiffs' allegations that investors were "given only projections of non-attainable gains" and that the hypothetical illustrations were based on "cherry-picked" time periods. *Id.*

at 1969. For instance, the district court observed that Plaintiff Webber's illustration is labeled "hypothetical," *id.* (quoting Aplt. App. vol. 7 at 1745), and states "[t]he values in this illustration are not guarantees or even estimates of the amounts you can expect from your annuity," *id.* (quoting Aplt. App. vol. 7 at 1747).

Plaintiffs correctly contend the disclaimer in the hypothetical illustrations does not undermine the allegations that Security Benefit committed fraud.[23] At the motion to dismiss stage, the disclaimers do not render implausible Plaintiffs' claim that Security Benefit used misleading backcasted data to induce their purchase of the annuity products. *See In re Flint Water Cases*, 960 F.3d 303, 329 (6th Cir. 2020) ("For a document to contradict the complaint, it must 'utterly discredit' the allegations." (citation omitted)).

The district court also cited an excerpt from the sales illustration that used various ten-year periods to simulate investment changes in the ALTV Index. According to the district court, these simulations contradicted the complaint's allegations that the hypothetical illustrations were based on

---

[23] Security Benefit identifies additional excerpts from Plaintiffs' signed Statements of Understanding—separate documents from the sales illustration the district court discussed—detailing Plaintiffs understood "that any [index] values shown are for explanatory purposes only and are not guaranteed." *E.g.*, Aplt. App. vol. 6 at 1473. These excerpts do not contradict the complaint's allegations either.

backcasted performance periods. Again, we disagree. The ten-year periods Security Benefit used to simulate changes in the ALTV Index occurred *within* the alleged backcast period. It is a reasonable inference that the simulations themselves are based on the allegedly misleading backcasted performance data. Under these circumstances, the district court erred in concluding the simulations contradicted Plaintiffs' allegations that Security Benefit used selective historical periods in its marketing materials to misleadingly illustrate the proprietary indices' unachievable future performance.

The district court also pointed to the "Guaranteed Illustrated Values" chart in the marketing materials, which depicted a potential 0% interest rate for the ALTV Index. The district court concluded the chart in this hypothetical illustration contradicted Plaintiffs' allegations, because the chart "represent[ed] . . . exactly what [Plaintiff Webber] claims to have earned." Aplt. App. vol. 8 at 1969. The district court correctly described the content of the chart but erred in concluding it fails to support an inference of fraud. The "Guaranteed Illustrated Values" chart represents the Standard & Poor's 500 would perform poorly relative to Security Benefit's proprietary index. Plaintiffs allege Security Benefit induced consumers to "purchase the [annuity products] and direct their premium dollars to the [proprietary indices]" by using marketing materials that depicted the

proprietary indices would generate returns "far exceeding the comparative performance of crediting options based on . . . indices like the [Standard & Poor's] 500." Aplt. App. vol. 1 at 173 ¶ 59. The "Guaranteed Illustrated Values" chart, therefore, does not contradict Plaintiffs' allegations about Security Benefit's use of misleading performance data to induce their purchase of the annuity products.[24]

We conclude Plaintiffs have plausibly alleged Security Benefit engaged in a scheme to defraud by using misleading backcasted performance data in its marketing materials to induce the purchase of its annuity products.

### c. Volatility Control Overlay

The district court next analyzed a single allegation about Plaintiffs' claim that Security Benefit misled investors by falsely suggesting the volatility control overlay had a "symmetrical impact" on an index's increases and decreases in price. Aplt. App. vol. 8 at 1969. Plaintiffs challenge the district court's singular focus, contending the court ignored

---

[24] On appeal, Security Benefit identifies other disclosures in Plaintiff Webber's hypothetical illustration that arguably contradict Plaintiffs' allegations—for example, the illustration's mention of its current participation rate and annual spread. However, these are summaries of the ALTV Index's current and guaranteed features at the time they were prepared for Plaintiff Webber. They do not contradict Plaintiffs' allegations that Security Benefit used misleading backcasted data to depict unattainable future returns for the proprietary indices.

other allegations about Security Benefit's failure to disclose the cumulative, negative effects the volatility control overlay had on their investments. Plaintiffs' argument is well taken.

The first "problem" with Plaintiffs' allegation, the district court concluded, was the ALTV Index Statement of Understanding "[did] not *actually* say that the volatility overlays have a 'symmetrical impact.'" Aplt. App. vol. 8 at 1970 (emphasis added). But, as we have explained, what Plaintiffs must plead is a material misrepresentation, not a false statement. Plaintiffs have alleged the excerpt from the ALTV Index Statement of Understanding in the complaint "misleadingly suggests" the volatility control overlay had a symmetrical impact. Aplt. App. vol. 1 at 186 ¶ 92. The excerpt allegedly creates a false impression because the volatility control overlay actually adversely impacted positive gains and offered Plaintiffs no benefits when the index decreased in price. That the ALTV Index's Statement of Understanding did not affirmatively state the volatility control overlay had a symmetrical impact is not a reason to conclude Plaintiffs' fraud claim is implausible.

The district court also determined the complaint "pleaded [no] facts to show that the volatility overlay did not operate as stated." Aplt. App. vol. 8 at 1970. That is incorrect. The complaint sufficiently alleges Security Benefit failed to disclose the "operation, impact or import" of the volatility

control overlay. Aplt. App. vol. 1 at 186 ¶ 90. Plaintiffs also alleged Security

Benefit never disclosed the volatility control overlay effectively reduced the

ALTV Index's participation rate. The volatility control overlay also

allegedly had a negative impact on the index cost spreads that Plaintiffs

paid to Security Benefit.

In support of affirmance, Security Benefit identifies an excerpt from

the Statements of Understanding it contends "accurately disclosed" the

volatility control overlay's operation, impact, and import:

> The [ALTV Index] has a volatility control overlay that is
> adjusted daily based on recent historical volatility, so that more
> volatility generally leads to a reduced exposure to the TVI and
> less volatility generally leads to more exposure. The overlay
> may thus reduce or increase the potential positive change in the
> [ALTV Index] relative to the TVI and thus may lessen or
> increase the interest that will be credited to a fixed index
> annuity allocated to the [ALTV Index] relative to one allocated
> to the TVI (which is not available). The overlay also reduces the
> cost to hedge the interest crediting risk to [Security Benefit].

Aplee Br. at 41 (quoting, e.g., Aplt. App. vol. 6 at 1475).

This excerpt does not contradict the allegations that Security Benefit

failed to disclose the "operation, impact or import" of the volatility control

overlay on their investments. It simply states the volatility control overlay

is adjusted daily and offers comparisons between two indices. As Plaintiffs

reasonably argue, this disclosure does not address how the volatility control

overlay affects the proprietary indices' participation rates or costs associated with the annuity products.

We conclude Plaintiffs have adequately alleged that Security Benefit made fraudulent misrepresentations regarding its volatility control overlay and this further supports the plausibility of the alleged fraudulent scheme.

### d. Disclosure of Asset Allocations

The last "allegation of fraud" the district court considered was Security Benefit's failure to "disclose the composition of assets" in the proprietary indices. Aplt. App. vol. 8 at 1970. Plaintiffs insist Security Benefit did not disclose the proprietary indices' assets or the rules it used to change the assets over time. According to Plaintiffs, therefore, no consumer could understand the proprietary indices' risks or potential returns. Plaintiffs acknowledge, however, that brochures provided to them about two proprietary indices actually disclosed their general categories of assets.

The district court found that brochures for the proprietary indices explained the components of each index, and Security Benefit had no duty to disclose additional information about the asset allocations. At bottom, the district court saw no "misleading impressions or half-truths . . . that required additional disclosures about asset allocations." *Id.* at 1971. As to this allegation, we conclude the district court did not err.

Security Benefit had no duty to disclose additional information about the asset allocations. Plaintiffs claim Security Benefit made two representations that give rise to a duty to disclose additional information. First, the proprietary indices allowed Plaintiffs to make money when other indices would not. Second, the volatility control overlay affected the proprietary indices. They argue these representations created a duty to disclose "all related material facts undermining the accuracy of its representations." Aplt. Br. at 70. And that failing to do so made Security Benefit's representations "partial . . . half-truths." *Id.*

But Plaintiffs have not shown how the two alleged representations establish an intent to defraud regarding the asset allocations. Recall an omission may be fraudulent where a fiduciary relationship exists between parties, *see Cochran*, 109 F.3d at 665, but that "[e]ven apart from a fiduciary duty" a misleading omission is only actionable as fraud where "it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled," *id.* (citation omitted).

Here, Plaintiffs have not shown how the two alleged representations they identify give rise to a duty to disclose additional information. Plaintiffs make no argument that their relationship with Security Benefit creates a duty to disclose. *See id.* ("While a fiduciary relationship is not an essential element of a wire fraud [claim], it can trigger a duty of disclosure as can

52

some other relationship of trust and confidence between the parties." (citations omitted)). Moreover, Plaintiffs identify nothing about the two representations intended to induce a "false belief" about the proprietary indices' asset allocations. *Gallant*, 537 F.3d at 1228. As the district court correctly determined, Plaintiffs have not shown Security Benefit had a duty to disclose more information about the asset classes.

But we must examine the whole complaint, *see Lemmon*, 614 F.3d at 1173, and determine if Plaintiffs have plausibly alleged the "central focus," *Kennedy*, 64 F.3d at 1475, of their wire and mail fraud claims: "[A] scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises." *George*, 833 F.3d at 1254 (citation omitted). Plaintiffs have done so, and our conclusion is not disturbed because Plaintiffs' allegations regarding asset composition are implausible. *See also Kan. Penn Gaming*, 656 F.3d at 1214 ("[T]o withstand a motion to dismiss, a complaint must have *enough* allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" (emphasis added) (quoting *Twombly*, 550 U.S. at 570)). Under the applicable standard of review, the complaint contains enough factual content to support Plaintiffs' claim that Security Benefit made material misrepresentations and omissions about the collective operation of the annuity products' features—including the proprietary indices' participation rates, caps, volatility control overlays,

and the hypothetical illustrations' use of backcasted data—and their negative impact on Plaintiffs' investments. Therefore, we conclude Plaintiffs have plausibly alleged "a plan or pattern of conduct which is intended to or is reasonably calculated to deceive," *Hanson*, 41 F.3d at 583, using material misrepresentations, *Schuler*, 458 F.3d at 1153, and the concealment of material facts, *Gallant*, 537 F.3d at 1228.

Finally, Security Benefit recites a list of "common sense" explanations to undermine the plausibility of Plaintiffs' fraud allegations; for example, that Security Benefit would have no reason to harm its reputation in the marketplace by designing and selling poorly performing annuity products. *See* Aplee. Br. at 30-33. We reject Security Benefit's invitation, at this stage, to draw inferences in its favor.[25]

---

[25] We note that, like the district court, the dissent at times also relies on impermissible defense-favorable inferences or ventures beyond the record before us. Information not alleged in the complaint, presented to the district court, or argued on appeal is simply not fair game in our review under Rule 12(b)(6). For example, the dissent claims we misconceive of the function and mechanics of the volatility overlay and explains that, in certain hypothetical circumstances, the volatility overlay may in fact work as Security Benefit alleges. Dissent at 11-13. This is precisely the sort of information that is not before us at this stage but that might be revealed during discovery. Plaintiffs, not Security Benefit, "receive[] the benefit of imagination" at this stage. *Twombly*, 550 U.S. at 563 (quoting *Sanjuan* v. *Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)).

According to the dissent, our decision today "may stifle security markets," Dissent at 1, and means "no marketer of investment products is safe," Dissent at 5. The dissent sounds a false alarm. Well-settled pleading rules and precedents will block frivolous suits and weed out claims with no facial merit. *Twombly*, 550 U.S. at 570; *cf. Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (describing the PSLRA's "twin goals" to "curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims"). Were immunity from suit our priority, it might require closing the courthouse doors entirely.[26] But our law does no such thing. *Cf. Krupski* v. *Costa Crociere S.p.A.*, 560 U.S. 538, 550 (2010) (referring to the "preference expressed in the Federal Rules of Civil Procedure . . . for resolving disputes on their merits"); *see also Woods*, 855 F.3d at 652 ("Manifestly, the rule of *Iqbal*/*Twombly* was not intended to serve as a federal court door-closing mechanism for arguably weak cases, even assuming this case fits the description of 'arguably weak.'").

When reviewing the district court's decision to dismiss a complaint, we make no determination of the merits of Plaintiffs' claims. *See Twombly*, 550 U.S. at 556. "Rule 12(b)(6) motions to dismiss are not designed to weigh

---

[26] We must disagree with the dissent that Plaintiffs' particularized, facially plausible complaint presents any "abuse of the courts." Dissent at 3. And we certainly cannot endorse the dissent's suggestion that the claims may be "fraudulent." *Id.*

evidence or consider the truth or falsity of an adequately pled complaint." *Tal*, 453 F.3d at 1266. We thus decline to join the dissent in conducting an inquiry beyond that allowed by the current procedural stage. According to the dissent, "[S]uch are the vagaries of the market that [the Plaintiffs] probably would not be complaining if they had acquired the ALTVI-linked investment to begin last year." Dissent at 15. Unlike the dissent, we will not speculate about the parties' litigation motives in reviewing the district court's order on appeal. Rather, we must accept the well-pleaded facts alleged as true, viewing them in the light most favorable to Plaintiffs. Having done so, we hold that Plaintiffs' complaint survives Security Benefit's Rule 12(b)(6) motion to dismiss.

## III

## Conclusion

The district court erred in dismissing Plaintiffs' RICO claim and their state-law claims for lack of particularity and plausibility. We reverse and remand for further proceedings consistent with this opinion.

21-3035, *Clinton v. Security Benefit*

**HARTZ**, J., dissenting.

I respectfully dissent. The majority opinion errs factually and legally. It improperly accepts the truth of allegations in the complaint that are contradicted by the sales documents on which the complaint is founded. And it adopts unprecedented notions of fraud that may stifle securities markets.

Regarding the factual error, I am well aware of the long-established proposition that on a motion to dismiss a complaint the court should accept as true all well-pleaded factual allegations in the complaint. But when the complaint describes the contents of a document, a court must reject an allegation that misstates the contents. As this court stated not long ago, "[A]lthough we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff, if there is a conflict between the allegations in the complaint and the content of the attached exhibit, the exhibit controls." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017); *see Farrell-Cooper Mining Co. v. U.S. Dep't of Interior*, 728 F.3d 1229, 1237 n.6 (10th Cir. 2013) ("Factual allegations that contradict a properly considered document are not well-pleaded facts that the court must accept as true." (brackets, ellipsis, and internal quotation marks omitted)); *Jackson v. Alexander*, 465 F.2d 1389, 1390 (10th Cir. 1972) ("[W]e need not accept as true . . . allegations of fact that are at variance with the express terms of an instrument attached to the complaint as an exhibit and made a part thereof."); *Droppleman v. Horsley*, 372 F.2d 249, 250 (10th Cir. 1967) (When a complaint includes an attached exhibit, "[the exhibit's] legal effect is to be determined by its terms rather than by the allegations of the pleader."

(internal quotation marks omitted)); 5A Charles Alan Wright, Arthur R. Miller & A. Benjamin Spencer, *Federal Practice and Procedure* § 1327, at 300–01 (4th ed. 2018) ("[W]hen a disparity exists between the written instrument annexed to the pleadings and the allegations in the pleadings, the terms of the written instrument will control, particularly when it is the instrument being relied upon by the party who made it an exhibit.").

In this case Plaintiffs alleged they were defrauded by the sales documents provided by Security Benefit. Rather than accept specific allegations of the complaint as gospel, which appears to be the approach of the majority opinion, we can compare them to the contents of the sales documents and reject those that misstate the contents. Other courts of appeals have done so in similar contexts, affirming dismissals of complaints alleging fraud by examining the purportedly fraudulent documents. *See, e.g.*, *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 318–19 (4th Cir. 2019) (in considering allegedly false and misleading merger proxy statement, the court "turn[ed] to the language of the Proxy [statement] which the [plaintiffs] incorporated into the amended complaint by reference" and determined that plaintiffs' allegations of fraud were unfounded); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 168–69 (3d Cir. 2014) (court's "full reading" of the allegedly false or misleading press release revealed that plaintiffs' account was "based on a selective reading of that document" and in fact "bolstered the District Court's conclusion that it contained no false statements"); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 775 (2d Cir. 1991) (the offer to purchase, which was subject to judicial notice, "misrepresented neither the form nor the value of the Merger Consideration actually received," contrary to the complaint's characterization of the document); *cf. Hampton v.*

*root9B Techs., Inc.*, 897 F.3d 1291, 1303 (10th Cir. 2018) (where third-party document relied upon to show that defendant's statement was false did not say what plaintiffs' complaint alleged it did, "the district court was not obliged" to adopt plaintiffs' allegation); *Emps.' Ret. Sys. of R.I. v. Williams Cos., Inc.*, 889 F.3d 1153, 1163 (10th Cir. 2018) (court rejected plaintiff's characterization, which relied on "misleadingly extract[ing]" a single comment from the broader context in which the remark was made). To do so is not, in the words of the majority opinion, to "conjecture that Plaintiffs will be unable to prove their claims." Maj. Op. at 19 n.12. It is to preclude the further abuse of the courts to pursue undisputably baseless (fraudulent?) claims. To use twenty-first century parlance governing review of motions to dismiss, allegations that contradict the documents on which they are based are not "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

As for the legal error, the traditional test for whether a statement is fraudulent is whether the statement is false or omits matters that must be disclosed to avoid leaving a misleading impression. Under the majority opinion, however, even if there is nothing false or misleading about the descriptions in the sales documents of each restriction on the earnings paid to investors, the seller may be liable for the failure to disclose the cumulative impact of the restrictions. From this time forward, I presume, the portion of each prospectus that sets forth the risks of an investment will need to include an additional (and extensive) discussion of how bad things can be if all the risks materialize. It will not be enough to give an accurate description of the investment; the seller will need to include an analysis of whether, given the disclosed facts, the investment is a good one.

But this introduction is perhaps too abstract. I now turn to an analysis of the majority opinion's specific rulings on the allegations of fraud in this case.

## I.    BACKCASTING

One of Plaintiffs' allegations accepted by the majority opinion is that Security Benefit's backcasting was deceptive because the backcast period was cherry-picked. But the allegation is contradicted by the sales documents. To make this clear, some background is in order.

Some of the investment products offered by Security Benefit used proprietary indices that had been recently created by other entities (such as Morgan Stanley, BNP Paribas, and the Royal Bank of Scotland) independent of Security Benefit. Security Benefit then created an investment product based on the index. Each index uses a proprietary formula to determine what particular mix of specific investments will be valued on any particular day. For example, a precious-metals index might be based on a mixture of the prices of gold and silver, with the ratio of the two metals determined by, say, that day's 15-year mortgage rate.

Before putting money into an investment based on the index, an investor might well want to know how well that index has performed in the past, and for how long. One may, or may not, want to jump into an investment based on the price of gold if that price has gone steadily higher over the past year, or invest only if the price has performed well over five or 10 years. Apparently, for a newly created index one can apply the proprietary formula to determine how it would have performed in the past. For example, the sales documents indicate that Bloomberg made those computations for the prior 20 years for the

ALTVI, on which one of the Security Benefit products was based. This "backcasting" of the index was used in the sales materials of Security Benefit.

The sales materials included spreadsheets showing how well the purchaser's investment would perform in the next 20 years based on the backcast performance of the investment. Plaintiffs' complaint alleges that Security Benefit cherry-picked the backcasting to encourage investment in an index by illustrating above-market gains by the index for a particular backcast period. If that were the only period used in the Security Benefit materials, the complaint would have a point. But what Security Benefit actually did was look at the backcast results for the prior 20 years and then provide four projections of how the buyer's investment in the associated Security Benefit product would fare over the next 20 years. One projection, the one about which Plaintiffs complain, is based on the backcast results for the best performing 10-year period within the prior 20 years (the sales materials state that this period for the ALTVI index was from March 1994 to March 2004). But the sales materials also include illustrations based on the backcast results for the worst performing 10-year period, the median performing 10-year period, and the most recent 10-year period (December 2003 to December 2013). If that is improper cherry-picking, then no marketer of investment products is safe. The cherry-picking allegation in the complaint is utterly discredited by the documents underlying the complaint.

One may question the value of backcasting. As investors are told in every prospectus, past performance is no guarantee of future results. If, as some theorists propose, markets perform randomly, so stock picking (and therefore index picking) is a waste of

time and effort, then perhaps one should pay no attention to backcast performance. But that is a distinct issue from whether particular backcasting is fraudulent.

## II.    PARTICIPATION RATES AND CAPS

The majority opinion also endorses the complaint's allegation that Security Benefit was deceptive in stating that its investment products are not capped and have a 100% participation rate. There are at least two significant problems with this allegation. First, Plaintiffs have not, and could not, point to anywhere in the sales documents provided to them before they invested where Security Benefit makes the alleged claims. The sales documents do not describe any investment product as uncapped, having no cap, or the like. Nor do they promise that the investment product will always have a 100% participation rate. On the contrary, the illustrations provided by Security Benefit described 100% as the "current" participation rate, a number which could be "change[d]. . . at any time" before the signing of the contract, but which once set at the beginning of an Index Term (the period during which the investor cannot transfer out of the index account and at the end of which the value is computed and credited to the investor), would be the same for the entirety of that term. Aplts. App., Vol. VII at 1746. The only guarantee for future Index Terms was that the rate would not go below 50%. And if the participation rate was set to drop during the next Index Term, the investor could switch to a different investment product. In any event, it was 100% during the entire period of the alleged fraud.

To circumvent this factual problem, Plaintiffs create another—by changing the definitions of *cap* and *participation rate*. Each term is a term of art related to how the performance of the selected index is translated into the performance of the associated

Security Benefit investment product. If there is a cap on the investment product, then no matter how well the index performs, the earnings of the investment product will not exceed the cap. If there is a 7% cap on the product and the index increases in value by 10%, the product will increase in value by only 7%. If the product has a participation rate, say 90%, then the increase in value of the product is only 90% of the increase in the value of the associated index. Thus, if the index increases in value by 10%, the product will increase in value by only 9%.

The records of Plaintiffs' investments show that their returns were never adjusted by a cap or by a participation rate below 100%. Indeed, Plaintiffs do not allege the contrary. One would think that that would end the matter. But Plaintiffs present a theory, endorsed by the majority opinion, that even though Security Benefit did not impose a cap and provided 100% participation rates, it limited gains on Plaintiffs' investments in other ways that had the "effect" of caps or lower participation rates. And, say Plaintiffs, even if those limitations were adequately described in the marketing documents (whether they were adequately described is a separate matter[1]), Plaintiffs should have been advised that these limitations *effectively* acted as caps or lower participation rates.

This endorsement by the majority opinion was in error. Although the other limitations imposed on the investment products reduced the return on those investments,

---

[1] I find it interesting that while Plaintiffs claim that Security Benefit did not disclose the cumulative effect of the limitations, their analysis of that cumulative effect is based on the disclosures in the sales documents regarding each of the limitations. One might infer that Plaintiffs believe that the disclosures of the individual limitations were accurate.

just as caps and lower participation rates would reduce the return, those limitations were not simply caps or lower participation rates by another name. Security Benefit was not, and is not accused of, playing a semantic game in which it says it has no caps but does have what it calls "crowns" that set an upper limit on returns. The other limitations are based on different parameters and work in different ways. The volatility adjustment, for example, turns on how much the value of the index varies from day to day. Its effect on the investment return is essentially independent of whether the return on the investment is approaching the maximum allowed under a cap, and it does not set a limit on what the investment return can be.

Plaintiffs' theory amounts to the proposition that one who markets an investment cannot say that it does not impose certain limits on returns that are commonly imposed on similar products unless it also says that other, quite distinct, limits it does impose (and discloses) effectively amount to one of those commonly imposed limits because they, too, reduce the potential return. This is quite an innovative theory. And the boundaries of its application are not at all apparent. The possibilities are endless. Say, there are three main engine features that can reduce the mileage efficiency of a motor vehicle: A, B, and C. The seller tells you about features B and C and announces pridefully that the vehicle you are looking at does not have feature A. Is the seller liable for fraud for failing to say that the engine effectively has feature A because features B and C reduce the efficiency? What is the difference between that marketing of the motor vehicle and the marketing of an investment product that accurately describes all the imposed expenses but also announces that a common expense is not imposed? Is it fraudulent to tout a credit card as offering no

monthly fee when the disclosed interest rate is higher than ordinary unless the credit-card company says that there is effectively a monthly fee because the higher interest rate similarly hurts the cardholder financially? Plaintiffs' "effectively" theory should be a nonstarter.

Further, I think it dispositive that Plaintiffs rely solely on the sales documents as the basis for their assertions of fraud in Security Benefit's failure to disclose how various features of Security Benefit's investment products combine to reduce returns on those products. Every allegedly negative feature is described in those documents. Plaintiffs' "contribution" is simply to analyze what is described and conclude (after a few years of poor results) that they made poor investments. Unlike the colorable claims of fraud of which I am aware, the complaint points to no undisclosed *factual* information to support the claim that Plaintiffs were deceived.

### III.    VOLATILITY CONTROL OVERLAY

The volatility control overlay is a feature of the ALTVI itself; it is not something used to translate the performance of that index to the performance of the associated Security Benefit investment product. It is used to translate the daily change in value of the underlying TVI to the change in value of the ALTVI. When the TVI price is volatile, the change (up or down) in the TVI is reduced in computing the ALTVI. When the TVI price is not volatile, the change in the ALTVI price may be greater than the change in the TVI price. One paragraph of the sales documents describes the volatility control overlay as follows:

> The ALTVI has a volatility control overlay that is adjusted daily based on recent historical volatility, so that more volatility generally leads to reduced exposure to the TVI and less volatility generally leads to more exposure. The overlay may thus reduce or increase the potential positive change in the ALTVI relative to the TVI and thus may lessen or increase the interest that will be credited to a fixed index annuity allocated to the ALTVI relative to one allocated to the TVI (which is not available). The overlay also reduces the cost to hedge the interest crediting risk to [Security Benefit].

Aplts. App., Vol. VI at 1475 (footnote omitted). Another paragraph states that "[t]he volatility control overlay reduces the impact of a falling price as well as increases in the price of the TVI." *Id.*, Vol. VII at 1660.

The complaint alleges that the description of the ALTVI is deceptive because it suggests that the overlay acts symmetrically with respect to increases and decreases in the ALTVI. But the paragraph does not say anything about symmetry. Indeed, in a separate paragraph of the sales documents it says that the overlay in itself can be expected to reduce returns on the investment. *See id.* at 1762 ("The volatility overlay . . . is also expected to reduce the potential positive change in the [ALTVI] and thus the amount of interest that will be credited to a fixed index annuity that is allocated to the [ALTVI].")

Nevertheless, the majority opinion endorses the deceptiveness claim on a different ground, stating that the volatility control overlay acts only to *reduce* the return on the Security Benefit investment product based on the ALTVI; in other words, it can never increase the return. It reaches this conclusion from the observation that the investment product guarantees that the investor will not suffer a loss in value of the investment. That conclusion is based on a misunderstanding of how the overlay and the guarantee work. The overlay is a daily adjustment used to compute the ALTVI from the TVI, while the guarantee

comes into play only at the end of the five-year investment term for the ALTVI-linked product (other products have shorter investment terms). A brief explanation may be useful.

What the guarantee says is that the investor will get at least all the original investment (say, $5000) back at the end of the five-year investment term. During those five years the value of the investment product will almost certainly go up and down. At one point the $5000 investment product may be valued at $6000. If the value drops to $5900 the next day, the guarantee does nothing. After all, the investment product is still worth more than the original investment. What if the value of the investment product drops the next day to $4900? Again, the guarantee does nothing. In particular, it does not revise the value upward to $5000. This is because the value of the investment product could still go up (and exceed $5000) by the end of the investment term. All the guarantee cares about is the value at the end of the five-year term. If the value on that date is $4900, the guarantee requires Security Benefit to pay the investor $5000.

In contrast, the volatility overlay applies on a daily basis. If the TVI has been volatile, the amount of the change in the ALTVI that day is reduced. For example, if the volatility has been sufficiently high, the overlay may reduce the change in the value of the ALTVI to only 50% of the change in the TVI. The 50% figure applies whether the index went up or down. If the TVI goes up (or down) 1%, the ALTVI will go up (or down) .5%. Also, if the TVI has not been volatile, the volatility overlay may increase the amount of the change in the value of ALTVI by more than the change in the value of the TVI. The change (up or down) in the value of the ALTVI may be as much as 150% of the change in the value of the TVI. (If volatility is high, the change in the value of the ALTVI may be only

10% of the change in the TVI. The sales documents state that the historical average of the overlay as of December 31, 2013, was 95.8%.)

Thus, the volatility overlay may increase the return to the investor in two different ways. First, if the volatility is low and the TVI is rising, the percentage increase in the value of the ALTVI will be greater than the percentage increase in the value of the TVI. The TVI may go up 5%, but the ALTVI goes up 6%. Second, if the volatility is high and the TVI is dropping, the percentage decline in the value of the ALTVI will be less than the decline in the TVI. If the TVI is volatile and drops by 1% during the day, the value of the ALTVI may drop by only .5 %. Because of this reduced loss, the ultimate value of the investment product based on the ALTVI is likely to be greater than it would be otherwise. Say, the value of the ALTVI is $6000 and the TVI declines by $100. Because of the overlay, the value of the ALTVI drops by only, say, $70, leaving it at $5930. If the value of the ALTVI remains steady until the end of the five-year investment term, it will be worth $30 more than if there had been no overlay. The no-loss guarantee, in contrast, would have no effect with regard to the one-day drop; if the value of the investment exceeds $5000 at the end of the five-year term, the guarantee does not add anything to the value.[2]

I see nothing deceptive in the description of the volatility control overlay in the sales documents. I may be missing something. But I can say with some confidence that the theory

---

[2] The majority opinion says that this analysis of the volatility overlay "is precisely the sort of information that is not before us at this stage but that might be revealed during discovery." Maj. Op. at 54 n.25. But the analysis is based entirely on disclosures in the allegedly fraudulent sales documents.

of deception alleged in the complaint, and endorsed by the majority opinion, is based on a misconception of the investment product.

### IV. THE EXCESS-RETURN FEATURE

The remaining claim of deception is that the sales documents did not explain what they meant when stating that indices on which Security Benefit based its investment products were excess-return indices. To endorse this claim would wreak havoc. What was the deception? *Excess return* is not some arcane term known only by the cognoscenti. Plaintiffs have not suggested that it had a special meaning confined to the Security Benefit sales documents. It was even defined where the documents described the MSDA index. *See* Aplts. App., Vol. VII at 1731 ("The Index is calculated on an excess return basis over an equivalent cash investment, which means that the Index level reflects the deduction of the Federal Funds interest rate that would apply to such a cash investment."). Perhaps sales documents should contain a glossary of terms with special meaning in the documents; but there is no reason to define terms that have well-known meanings in the context.

### V. CONCLUSION

Everyone who markets an investment hopes that others will think it will be profitable. Sometimes it does not turn out that way. A bad result does not imply fraud by the seller. *See Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 8 (2d Cir. 1996) ("Not every bad investment is the product of misrepresentation."). Here, Plaintiffs assert, without

any supporting analysis or explanation,[3] that there is no way that their investments could have turned out well. *See, e.g.*, Aplts. App., Vol I at 157 ("[T]he Synthetic Indices would—by design—produce near-zero returns."); *id.* at 180 ("[T]he Synthetic Indices are designed and administered to generate near-zero returns."); *id.* at 185 ("[T]he collection of commodities comprising the ALTV Index . . . have an expected near-zero return."); Aplts. Br. at 4 ("[Security Benefit] knew the extraordinarily complicated Annuities and Proprietary Indices were in fact destined to produce near-zero or below-market returns to annuity owners."). But such are the vagaries of the market that they probably would not be complaining if they had acquired the ALTVI-linked investment to begin last year.[4] Courts

---

[3] The majority opinion states that "Plaintiffs cited statistical analysis of the assets underlying the indices, which showed their expected returns were near zero." Maj. Op. at 44. What the complaint alleges, in its entirety, is "standard economic models using recognized statistical methods (such as the Monte Carlo analysis) demonstrate that the expected returns for the assets underlying the Synthetic Indices are nearly zero once the spreads and costs of the Secure Income and Total Value Annuities are taken into account." Aplts. App., Vol. I at 179. The complaint provides no citation to any study, making it impossible to determine whether there was any particular analysis of the investments by the Plaintiffs, or whether they are just studies saying generally that investors cannot beat the market. Such a conclusory assertion is entitled to no weight in assessing the validity of the complaint.

[4] During 2022, while the S&P 500 dropped in value by 20%, the ALTVI went up 4%:

should eschew assuming the role of becoming the final backstop to protect disappointed

investors.



*Annuity Linked TVI Index (USD)*, MerQube, https://merqube.com/index/NWSALTVI (last visited Jan. 3, 2023).